
EOD
01/11/2016

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BRIAN MATTHEW BLACK, | § | Case No. 15-40546 |
| | § | (Chapter 7) |
| Debtor. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The court conducted an evidentiary hearing on the motion of the debtor, Brian Matthew Black, to disqualify Curtis Castillo, PC as counsel for Stephanie Curtis and Curtis Restaurant Holdings, LLC [Docket No. 57] as well as the debtor's motion to disqualify Curtis Castillo, PC as counsel for David Cook [Docket No. 58]. The following are the court's findings of fact and conclusions of law. To the extent any of the findings of fact are considered conclusions of law, they are adopted as such. Likewise, to the extent any of the conclusions of law are considered findings of fact, they are adopted as such.

### I. FINDINGS OF FACT

1.  The debtor filed a petition for relief under chapter 7 of the Bankruptcy Code on March 31, 2015.

2.  The debtor is a restauranteur. Beginning in 2004, the debtor owned and operated Black Consultants and Associates, Inc. ("BCAI") d/b/a Mi Piaci ("Mi Piaci 1"). Mi Piaci 1 was located in Addison, Texas.

3.  Prior to bankruptcy, in June 2012, Curtis Castillo, PC (the "Firm") assisted the debtor in forming a restaurant management company called Black Restaurant Management Group ("BRMG"). The debtor was the 100% owner of BRMG.

4. In or around September 2012, the debtor and several investors opened a restaurant called Ocho Kitchen + Cocktails in Dallas, Texas. Ocho quickly failed.

5. The debtor hoped to open a new restaurant at the Ocho location. He was negotiating with a potential investor. However, BCAI d/b/a Mi Piaci 1 was behind on its rent and was attempting to renegotiate its lease with its landlord. Dallas Valet Service, Inc. had abstracted a judgment for $17,215 against BCAI, and the IRS had filed three tax liens against BCAI in the aggregate amount of $116,088 for unpaid payroll taxes.

6. The debtor sought counsel from the Firm in April 2013 after the landlord for Mi Piaci 1 locked out the restaurant. The debtor offered Stephanie Curtis, who owns the majority of the equity in the Firm, a 10% interest in BCAI d/b/a Mi Piaci 1 if the Firm would take the case. BCAI and the debtor did not have the funds to pay Curtis for any legal work.

7. Curtis was intrigued by the debtor's offer. Although she was negotiating with the debtor to acquire a portion of his equity interest in BCAI for herself, personally, she billed at least some of her negotiations to the entity. She testified at trial that she took a 10% interest in BCAI. However, she further testified that she did not agree to accept the 10% interest in BCAI in lieu of the Firm's legal fees.

8. The debtor considered Mi Piaci 1 to be his restaurant. He had not been careful in observing the corporate formalities for BCAI d/b/a Mi Piaci 1.

9. The debtor shared business information with the Firm, including financial information for BCAI. From April through June 2013, the Firm worked on creating a corporate binder for BCAI. The Firm's time records include time spent creating and editing bylaws and organizational meeting minutes from 2002 – 2013.

10. The Firm also researched tax issues, among other things, relating to the debtor's businesses, and Stephanie Curtis met with the debtor on numerous occasions. The Firm discovered the tax liens filed by the IRS against BCAI as well as the judgment in favor of Dallas Valet Services against BCAI. In light of BCAI's financial problems, Curtis advised the debtor to transfer any intellectual property from BCAI to himself or some other entity.

11. The debtor, as president of BCAI, and Curtis, as president and shareholder of the Firm, executed a retainer agreement effective June 18, 2013.

12. On June 2, 2013, Curtis met with the debtor to discuss creating a new legal entity for the new restaurant the debtor was planning to open. At or around this time, Curtis decided to personally invest in the debtor's new restaurant.

13. The Firm assisted the debtor in forming MP Concepts 2, LLC ("MP2"), which operated under the tradename Mi Piaci Cucina Italiana ("Mi Piaci 2").

14. MP2 formed on June 7, 2013. The debtor was the 100% owner of Mi Piaci 2 at the time of its formation. Curtis Restaurant Holdings, LLC formed at or around the same time as MP2. Stephanie Curtis was the sole member, manager and director of Curtis Restaurant Holdings.

15. On June 27, 2013, the debtor and his wife, as the managers of MP2, executed a Unanimous Written Consent whereby Curtis Restaurant Holdings acquired a 30% interest in MP2. The Unanimous Written Consent recites that Stephanie Curtis, individually, had advanced $50,000 to MP2 and would provide a $200,000 revolving line of credit to be used, first, to pay back the cash advance.

16. Curtis obtained a $200,000 line of credit from ViewPoint Bank and committed to advance those funds to MP2 under a revolving line of credit. MP2 executed a Security

Agreement with Curtis dated June 18, 2013, providing Curtis with a lien on all or substantially all of its assets, including its intellectual property. Curtis filed a UCC-1 Financing Statement with the Texas Secretary of State on July 18, 2013.

17. On June 27, 2013, the Firm entered into a retainer agreement with MP2. The retainer agreement generally provides that the Firm would assist MP2 with all general legal services relating to its business. The retainer agreement further provides that MP2 would make monthly payments of $3,000 to the Firm. Stephanie Curtis signed the retainer agreement as a member of MP2. She also executed the retainer agreement on behalf of the Firm as the Firm's president and a shareholder of the Firm.

18. MP2 did not make any monthly payments to the Firm. Curtis understood that MP2 and the debtor lacked the funds to pay the Firm for its legal work.

19. MP2 entered into a management contract with BRMG to operate Mi Piaci 2. The debtor owned and operated BRMG.

20. Mi Piaci 1's landlord locked out Mi Piaci 1 on July 25, 2013, and the restaurant closed. On August 26, 2013, the Firm filed an answer as counsel for BCAI and the debtor, individually, in a suit brought by Mi Piaci 1's landlord.

21. Although the Firm's retainer agreement was with MP2, not the debtor, the record does not reflect that Curtis or the Firm ever told the debtor they were not his personal legal counsel. The Firm never advised the debtor to obtain, or to consider obtaining, separate legal counsel for his personal legal issues.

22. Mi Piaci 2 opened its doors on August 7, 2013. The restaurant quickly failed. Mi Piaci 2 closed its doors and ceased all operations on April 14, 2014.

23. At or around the time Mi Piaci 2 closed, a dispute arose between the debtor and Curtis about the use of funds in MP2's bank accounts. The debtor and Curtis accuse each other of the unauthorized withdrawal of funds for personal use, among other things. The debtor also accuses Curtis of failing to fully fund MP2 and of stealing his business by foreclosing upon her liens on MP2's assets.

24. Prior to the falling out between Curtis and the debtor, the Firm represented the debtor, personally, in the following matters:

- The Firm formed MP2 for the debtor, who was, initially, the sole owner.
- The Firm represented the debtor in connection a lawsuit brought by Mi Piaci 1's landlord, Prestonwood Pond, LLC.
- The Firm represented the debtor in a collection action brought by Hue, LLC, regarding a $6,209.35 debt for interior design work.
- After the debtor received calls on his personal cell phone, the Firm sent a cease and desist letter to a third-party agency seeking to collect a debt owed to an equipment servicing company named "The Works." The Firm requested payment of damages to the debtor.

25. The debtor obtained counsel other than the Firm after the dispute arose with Curtis.

26. The debtor's bankruptcy schedules list the Firm, Curtis, and Curtis Restaurant Holdings as unsecured creditors owed business debts in an unknown amount.

27. Stephanie Curtis and Curtis Restaurant Holdings each filed proofs of claim for $1,000,000 against the debtor. They assert unliquidated claims for fraud, embezzlement, and breach of fiduciary duty.

28. Stephanie Curtis and Curtis Restaurant Holdings also filed an adversary complaint objecting to the debtor's discharge under 11 U.S.C. § 727 as well as an adversary complaint objecting to the discharge of the debtor's obligations to them under 11 U.S.C. § 523. Their adversary complaints are pending before Judge Parker.

29. In addition to their adversary complaints, Stephanie Curtis and Curtis Restaurant Holdings object to the exemptions claimed by the debtor. The objection to the debtor's exemptions is before this court.

30. Another creditor, A. David Cook, joined in their exemption objection. The debtor's schedules list "Dave Cook" as an unsecured creditor owed a business debt in an unknown amount.

31. In the exemption objection, Stephanie Curtis and Curtis Restaurant holdings argue that the debtor failed to include all of his assets in his bankruptcy schedules and, therefore, it is impossible to evaluate the propriety of his claimed exemptions. The allegedly missing assets include jewelry, household furniture, vehicles, and country club memberships. They also argue that the debtor's valuation of the two homes listed in his schedules is less than the actual value of the properties. They seek a denial of all of the debtor's claimed exemptions. Curtis and Curtis Restaurant Holdings also seek to establish a constructive trust on the debtor's home based on allegations of fraud, among other things.

32. The Firm represents Stephanie Curtis and Curtis Restaurant Holdings in the debtor's bankruptcy case. In addition, the Firm filed Cook's joinder in the exemption objection. The Firm represented at trial that it was not providing any ongoing legal counsel to Cook and that it merely filed the joinder for him.

## II. CONCLUSIONS OF LAW

### A. Summary of the Parties' Arguments

1. The debtor contends that the Firm has a conflict-of-interest and should be disqualified from any representation of Stephanie Curtis and Curtis Restaurant Holdings as the debtor's prior counsel. He also contends the Firm should not be allowed to take a position adverse to him by representing his adversaries and must be disqualified as counsel for creditors – specifically, Stephanie Curtis, Curtis Restaurant Holdings, and A. David Cook.

2. The debtor specifically contends that the Firm was privy to confidential information through its prior attorney-client relationship with him. The debtor contends that the Firm is using such information to assist Stephanie Curtis, Curtis Restaurant Holdings and A. David Cook in their litigation against the debtor in this bankruptcy case.

3. The Firm argues that Curtis and Curtis Restaurant Holdings should not be denied their choice of counsel merely because the Firm previously provided limited representation of the debtor's affiliated corporations and business entities. The Firm also argues that, to the extent it obtained confidential information of the debtor that would cause an "issue" with its representation of Curtis and Curtis Restaurant Holdings, the debtor's "fish-bowl" bankruptcy filing would allow disclosure. The Firm also argues that the debtor waived his ability to seek disqualification because he waited too long to file his motion.

### B. Waiver

4. As an initial matter, the debtor did not waive his ability to seek the Firm's disqualification. He did not delay for an extended period of time or wait until the eve of trial to file his motion. *See, e.g., Abney v. Wal-Mart*, 984 F.Supp. 536, 530 (E.D. Tex. 1997). The

debtor filed his motion for disqualification less than two months after Curtis and Curtis Restaurant Holdings objected to his exemptions.

### C. The Relevant Legal Standards for Disqualification

5. Turning to the debtor's motion, motions to disqualify counsel are substantive motions which arise under this court's duty to supervise the conduct of attorneys who appear before it and which are governed by standards arising under federal law. *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992). This court's Local Rules of Bankruptcy Procedure recognize that the ethical obligations imposed upon attorneys practicing in this district cannot be quantified by one particular set of guidelines. *See* LBR 1001(c)(1) (incorporating the Local District Court Rules governing attorney admission, discipline, and disbarment). The Local District Court Rules state that:

> The standards of professional conduct adopted as part of the Rules Governing the State Bar of Texas shall serve as a guide governing the obligations and responsibilities of all attorneys appearing in this court. *It is recognized, however, that no set of rules may be framed which will particularize all the duties of the attorney in the varying phases of litigation or in all the relations of professional life.* Therefore, the attorney practicing in this court should be familiar with the duties and obligations imposed upon members of this bar by the Texas Disciplinary Rules of Professional Conduct, court decisions, statutes, and the usages, customs and practices of this bar.

Local District Court Rule AT-2(a) (emphasis added).

6. Here, the debtor's motion presents a cautionary tale about what can happen when a lawyer fails to carefully delineate between corporate and individual representation as well as her own self-interest. The parties' arguments and the evidence introduced at trial implicate several of the Texas Disciplinary Rules of Professional Conduct (the "Texas Rules"): Texas Rule 1.05 (Confidentiality of Information); Texas Rule 1.08 (Conflict of Interest: Prohibited

8

Transactions); Texas Rule 1.09 (Duties to Former Clients); and Texas Rule 1.12 (Organization as Client).

### 1. The Entity Theory of Representation

7.      At the hearing on the motions to disqualify, counsel for the Firm acknowledged that the debtor was a former client, at least technically, but disputed whether the debtor was the Firm's true client.  The Firm did not enter into a written agreement to represent the debtor.  The Firm entered into retainer agreements with BCAI and MP2.  Thus, the Firm argues that its true clients were BCAI and MP2.

8.      The Firm appeared for the debtor, personally, in the lawsuit brought by Mi Piaci 1's landlord as well as the lawsuit brought by the interior designer.  The Firm filed pleadings in each of those actions as counsel for the debtor.  The debtor, therefore, is a former client of the Firm for purposes of disqualification.

9.      The Firm's argument appears to be based on an entity theory of representation. Texas Rule of Disciplinary Procedure 1.12 generally provides that a lawyer employed or retained by an organization represents the organization itself, not the officers or directors who act for it. Tex. Disciplinary R. Prof'l Conduct 1.12(a), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. A.  *See generally Restatement (Third) of the Law Governing Lawyers* § 96(1) cmt. (b) ("The so-called 'entity' theory of representation … is now universally recognized in American law, for purposes of determining the identity of the direct beneficiary of legal representation of corporations and other organizations.").

10.     It is well settled that the entity-representation rule usually applies to closely held corporations just as it does to public corporations.  Where a corporate officer communicates with corporate counsel about the "officer's role and functions within the corporation," or about

"corporate matters," the attorney-client privilege belongs to the corporation, not the officer. *Matter of Bevill, Bresler & Schulman Asset Mng't Corp.,* 805 F.2d 120, 124–25 (3rd Cir. 1986) (citing *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348 (1985)).

11. It is possible, however, for an officer of a corporation to have a personal attorney-client relationship with corporate counsel. *Bevill,* 805 F.2d at 124–25. In situations involving closely held corporations, such as the debtor's businesses, it is not uncommon for an officer's interests to be essentially identical to the corporation's interests. If the officer relies upon the corporation's attorney for personal legal services, the attorney for the corporation may inadvertently become the individual's lawyer as well.

12. A corporate officer may conclude that counsel represents him, individually, as well as the corporation when counsel fails to clarify his or her role. *See generally*, Mary C. Daly, *Avoiding the Ethical Pitfall of Misidentifying the Organizational Client*, 574 PLI/Lit 399 (1997). Even where no express contract has been entered into and no fees are paid, an "implied" attorney-client relationship may exist if a party submitted confidential information to an attorney with the reasonable belief that the lawyer was acting as the party's attorney. *See Westinghouse v. Elec. Corp v. Kerr-Corp*, 580 F.2d 1311, 1319 (7th Cir. 1978) ("The professional relationship … 'hinges upon the client's belief that he is consulting a lawyer in that capacity and has manifested an intention to seek professional legal advice.'") (quoting McCormick on Evidence § 88, at 179 (2d ed. 1972)).

13. A corporate officer seeking to assert a personal attorney-client relationship with respect to communications with corporate counsel must show that: (1) he approached counsel for the purpose of seeking legal advice; (2) when he approached counsel he made it clear that he was seeking legal advice in his individual rather than in his representative capacity; (3) corporate

counsel saw fit to communicate with the officer in his individual capacity, knowing that a possible conflict could arise; (4) conversations between the officer and corporate counsel were confidential; and (5) the substance of his conversations with corporate counsel did not concern matters concerning the company or its general affairs. *Bevill,* 805 F.2d at 123 (3rd Cir. 1986).[1]

14. In this case, creditors of Mi Piaci 1 were attempting to collect from the debtor, individually, for unpaid business debts. He clearly sought representation from the Firm in his individual capacity. The weight of the credible evidence introduced at trial established that the Firm did not take the position that it was only representing BCAI and MP2 but not the debtor, individually, until after the representation had ended.

15. Curtis frequently met with the debtor. Curtis and other attorneys at the Firm advised the debtor with respect to the litigation, held themselves out as his personal counsel in specific matters, negotiated with the creditors who were asserting claims against the debtor, individually, and filed pleadings on the debtor's behalf. Further, the benefit of the Firm's advice about how to hold the intellectual property of BCAI and how structure BCAI, MP2 and the debtor's other businesses for tax purposes flowed to the debtor as the equity holder.

16. For all of these reasons, the Court concludes that the Firm was not working exclusively for MP2 and that MP2 was not its only "true" client. The Firm also served as the debtor's personal attorney. However, the analysis does not stop here. Although the Firm represented the debtor for some purposes, this does not mean that they represented him with respect to all legal matters or that there is necessarily a conflict-of-interest that disqualifies the Firm with respect to the objection to the debtor's claim of exemptions.

---

[1] Other circuits have adopted the *Bevill* test. *See United States v. Graf,* 610 F.3d 1138 (9th Cir. 2010); *In re Grand Jury Subpoena (Newparent),* 274 F.3d 563 (1st Cir. 2001); *In re Grand Jury Subpoenas (Roe and Doe),* 144 F.3d 653 (10th Cir. 1998); *United States v. International Brotherhood of Teamsters,* 119 F.3d 210 (2nd Cir. 1997).

## 2. Conflicts of Interests with Former Clients

### (a) Substantially Related Matters

17. Next, the Firm argues that even if the debtor was a former client, its objections to the debtor's claimed exemptions are unrelated to the prior, limited representation of the debtor.

18. Texas Rule 1.09(a) is entitled "Conflict of Interest: Former Client" and provides as follows:

> (a) Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:
> \* \* \* \* \* \*
> (2) if the representation in reasonable probability will involve a violation of Rule 1.05; or
> (3) if it is the same or a substantially related matter.

Tex. Disciplinary R. Prof'l Conduct 1.09(a)(2)-(3), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. A.[2]

19. Texas Rule 1.09 adopts the common law "substantial relationship" test in determining what constitutes a "same or a substantially related matter." *See In re Am. Airlines, Inc.,* 972 F.2d 605, 617 (5th Cir. 1992). Under the "substantial relationship" test, the party seeking disqualification must establish "1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and 2) a substantial relationship between the subject matter of the former and present representations." *Id.* at 614.

20. Texas Rule 1.09(b) explains that if one attorney has a conflict under 1.09(a), the conflict is imputed to all the members of the attorney's firm. *See* Tex. Disciplinary R. Prof'l Conduct 1.09(b); *id*. at 1.09(b) cmt. 7. *See also In re ProEducation Intern., Inc.,* 587 F.3d 296,

---

[2] While Texas Rule 1.09 and Model Rule 1.9 have some linguistic differences, they are "identical ... in all important respects." *In re Am. Airlines, Inc.,* 972 F.2d 605, 615 n. 2 (5th Cir. 1992).

300 (5th Cir. 2009). The Model Rules have an identical rule regarding conflict imputation. *See* Model Rule of Prof'l Conduct 1.10(a).

21. Here, as previously discussed, an actual attorney-client relationship existed between the debtor and the Firm. The debtor bears the burden of proving the present and prior representations are substantially related. In discharging this burden, the debtor must delineate with specificity the subject matter, issues and causes of action common to the prior and current representations. *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1028-29 (5th Cir. 1981).

22. Courts routinely consider three factors when determining whether a substantial relationship exists between the current and prior representations: (1) the nature and scope of the prior representation; (2) the nature and scope of the current representation; and (3) during the prior representation, the possibility that the client disclosed confidences which could be relevant to the current action and detrimental to the former client in the course of the current litigation. *See, e.g., Talecris Biotherapeutics, Inc. v. Baxter International Inc.*, 491 F.Supp.2d 510 (D. Del. 2007); *Commonwealth Ins. Co. v. Graphix Hot Line, Inc.,* 808 F.Supp. 1200, 1204 (E.D. Pa. 1992).

23. The parties in this case dispute whether there is a relationship between the exemption objection and the Firm's representation of the debtor. If it is established that the prior matters are substantially related to the present case, "the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation." *Duncan,* 646 F.2d at 1028.

24. The debtor sought legal representation from Curtis at a critical time for himself and his businesses. Mi Piaci 1 was facing a potential lockout by its landlord, several creditors

had secured personal judgments against BCAI, he was facing lawsuits for rent and other debts associated with Mi Piaci 1, and he was personally liable for some of the business debts as a guarantor. The debtor also was seeking financing to open a new restaurant.

25. In addition to its corporate representation of BCAI and MP2, the Firm counseled the debtor about the ownership structure of his businesses for tax purposes. The Firm counseled the debtor regarding how to hold and protect Mi Piaci 1's intellectual property. The Firm also represented the debtor in several legal actions, or threatened legal actions, by creditors of his businesses.

26. The objection to the debtor's exemptions does not involve substantially the same matters or legal disputes. The exemption objection involves a dispute regarding the amount and value of the debtor's assets. Information regarding whether the debtor owned a sofa, drove certain vehicles, or enjoyed country club memberships, for example, was not relevant to the Firm's prior representation of the debtor. Information regarding the debtor's personal assets would not ordinarily or necessarily have been obtained by the Firm in connection with forming a new corporation for the debtor or responding to demand letters and state court complaints by creditors. The Court, therefore, concludes that the exemption objection is not substantially related to the Firm's prior representation of the debtor.

### (b) Using Confidential Information of a Former Client

27. Even if the exemption objection is not substantially related to the Firm's prior representation of him, the debtor argues the Firm should be disqualified. The debtor asserts the Firm is using confidential information it obtained from him to his detriment.

28. Texas Rule 1.09(b) prohibits a lawyer from representing another person in a matter adverse to the former client "if the representation in reasonable probability will involve a

violation of Rule 1.05 ….." Texas Rule 1.05, in turn, prohibits lawyers from "[using] confidential information of a former client to the disadvantage of the former client after the representation is concluded." Tex. Disciplinary R. Prof'l Conduct 1.05(b)(3).

29.     In addition, Texas Rule 1.09(c) prohibits a lawyer from using information relating to the representation to the disadvantage of the former client except as permitted by the Texas Rules or when the information has become "generally known." The fact that information is in the public record does not necessarily mean the information is "generally known." *See Turner v. Commonwealth of Va.*, 726 S.E.2d 325, 333 (Va. 2012) ("There is a significant difference between something being a public record and it also being 'generally known,'" that is, within the basic understanding and knowledge of the public.)

30.     Adverse use of confidential information is not limited to disclosure. It includes, among other things, knowing what to ask for in discovery, which witnesses to depose, what questions to ask them, what lines of attack to pursue, what settlements to accept, and what offers to reject. *Ullrich v. Hearst Corp.,* 809 F.Supp. 229, 235–36 (S.D.N.Y. 1992)); *Webb v. E.I. DuPont de Nemours & Co., Inc.*, 811 F.Supp. 158, 162 (Del. 1992).

31.     Whether there is a "reasonable probability" that the representation will involve a violation of Rule 1.05 is a question of fact. Tex. Disciplinary R. Prof'l Conduct 1.09 cmt. 4. The movant can demonstrate this probability by "pointing to specific instances" where he revealed confidential information to opposing counsel, and by explaining how that information is relevant to the present matter. *Duncan v Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 646 F.2d 1020, 1032 (5th Cir. 1981). A court also may consider the length and nature of the lawyer's previous representation of the former client in determining whether the attorney possesses confidential information. *See id.* at 1032 (noting firm's claims that "it has never been general counsel to its

former client but instead has represented [the former client] in a limited number of local matters and only for the duration of each matter .... [and i]t has not had ... [a] pervasive, day-to-day relationship with its client").

32. Here, the debtor has not pointed to specific instances where he revealed confidential information to the Firm counsel or explained how any confidential information he revealed is relevant to the objection to his exemptions. The Firm's representation of the debtor was relatively brief and limited to specific matters. Moreover, as previously discussed, the objection to the debtor's exemptions does not involve substantially the same matter or legal dispute in which the Firm previously counseled the debtor.

33. In his motion to disqualify the Firm, the debtor asserts that the Firm is using information it learned about him, personally, during its representation of him against him in this proceeding. For example, he asserts that Curtis knows about his country club memberships because he invited her to the country clubs during the period in which the Firm was advising him. He argues that the Firm's prior representation of him is giving Curtis and Curtis Restaurant Holdings a "leg up" in this bankruptcy case.

34. Curtis acquired personal knowledge of some of the debtor's vehicles and country club memberships, among other things, during a brief business relationship with the debtor. However, any knowledge she obtained about the debtors' vehicles, apparel, jewelry, and country club memberships did not relate to her Firm's representation of him. Further, such information was not confidential.

35. Confidential information includes both privileged and unprivileged information. *See* Tex. Disciplinary R. Prof'l Conduct 1.05. at 1.05(a). Unprivileged information includes "all information relating to a client or furnished by the client ... acquired by the lawyer during the

course of or by reason of the representation of the client." *Id.* However, confidential information does not include facts or the personal observations of Curtis. Any number of persons could and did see the debtor wearing jewelry, driving cars, and enjoying country club memberships. *See Upjohn Co. v. United States,* 449 U.S. 383, 395–96, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) ("[T]he protection of the [attorney-client] privilege extends only to communications and not to facts. A fact is one thing and a communication concerning the fact is an entirely different thing."). *See also In re Equip. Leassors of Pa., Inc.,* No. 02–2985, 2002 WL 31819642 at *7 (E.D. Pa. Dec. 12, 2002) (noting that "the personal observations of an attorney which are not derived directly through communications with his client do not fall under the auspices of the attorney-client privilege").

36. The Firm conducted independent legal research prior to filing the objection to the debtor's exemptions for Curtis and Curtis Restaurant Holdings. The objection is based, in large part, on a close reading of the debtor's schedules and searches of public records available to any creditor. Objections to the valuation of real property, and disputes regarding the nature and extent of a debtor's interest in real and personal property, are common in bankruptcy.

### III. CONCLUSION

For all the foregoing reasons, the Court concludes that the objection to the debtor's exemptions filed by the Firm on behalf of Curtis and Curtis Restaurant Holdings does not substantially relate to the Firm's prior representation of the debtor. The Court likewise concludes that the joinder filed by David Cook also does not substantially relate to the Firm's prior representation of the debtor. The Court expresses no opinion as to whether a conflict might exist as to the adversary proceedings pending in front of Judge Parker or any other legal dispute in connection with this bankruptcy case.

The Court will enter a separate order denying the motions to disqualify the Firm consistent with these Findings of Fact and Conclusions of Law.

Signed on 1/11/2016

_____ SR
HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE